**DELCO ELECTRONICS CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 97–86C.**

United States Claims Court.

June 23, 1989.

Clarence T. Kipps, Jr., Washington, D.C., for plaintiff. John C. Thede, Alan C. Brown and Thomas D. Dinakus, of counsel.

Steve C. Vaughn, Irvine, Cal., and Robert D. Witte and Alan M. Lestz, Bronxville, N.Y., for Gull, Inc.

Sheryl L. Floyd, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Col. Roger D. Graham, Dept. of Air Force and Ward Buckles, Air Force Contract Law Div., of counsel.

## OPINION

MARGOLIS, Judge.

Plaintiff Delco Electronics Corporation seeks to recover $31.5 million as a total equitable adjustment on behalf of itself and three subcontractors under a contract with the Air Force. The defendant agrees that plaintiff is entitled to an equitable adjustment, but seeks to limit the amount to approximately $7.9 million. On May 22, 1987, the court ruled that the plaintiff's recovery was not limited to a not-to-exceed (NTE) offer of $14.2 million, a sum which the government has already paid, because the court determined that the government failed to accept plaintiff's NTE offer. That decision is reported at 12 Cl.Ct. 367.

A seven-day trial was held in Washington D.C. from September 14, 1988 until September 23, 1988. The parties introduced nearly 500 exhibits and provided over 1300 pages of transcribed testimony. After review of the entire record, the court finds that the weight of the evidence presented supports the plaintiff's claims. The court finds that the plaintiff is entitled to a total equitable adjustment of $28,324,284. The plaintiff was already paid $14,219,000 of this amount. Accordingly, judgment will be entered in favor of the plaintiff for $14,105,284 plus interest.

## FACTS

### A. *The FSA/CAS Contract*

On December 14, 1981, the Air Force awarded General Motors Corporation con-

tract F34601–82–C–0180 for design and production of a Fuel Savings Advisory and Cockpit Avionics System for KC–135 and other –135 aircraft (the FSA/CAS contract). The contract was subsequently transferred to Delco Electronics Corporation, a division of General Motors. One of the principal components of the system to be provided by Delco under the FSA/CAS contract was the Integrated Fuel Management and Center of Gravity System (IFM/CGS) referred to herein as the "fuel panel."

Delco subcontracted portions of the work to be performed under the FSA/CAS contract. Delco entered into a subcontract with Gull, Inc. (Gull) to design and manufacture the fuel panel, as well as the Tank Interface Unit (TIU) and the Remote Display Unit (RDU). Delco entered into a subcontract with Electrospace Systems, Inc. (ESI) to provide the "Group A" kits which consisted of the wiring, cables, brackets, and installation and mounting hardware, necessary for installation of the FSA/CAS equipment into various configurations of aircraft. Delco entered into a subcontract with Rockwell International Corporation–Collins Government Avionics Division (Collins) to design and manufacture the Integrated Control and Display Unit (ICDU) and the Bus System Interface Unit (BSIU).

Delco itself designed and manufactured the Fuel Savings Advisory System computer (FSAS computer). Delco also designed and manufactured test equipment, reviewed and supervised the work of its subcontractors, and acted as the system integrator. Delco's efforts were carried out at its facilities in both Milwaukee, Wisconsin and Santa Barbara, California.

### B. *The Initial Fuel Panel Change*

At a system design review in January 1982 (less than one month after award of the contract), the Air Force advised Delco that it had decided to relocate a radar scope to the area of the cockpit that was to have been occupied by the fuel panel, and to provide space for a second ICDU. This change resulted in a reduction in the space available for the fuel panel and necessitated a major redesign of the fuel panel. The Air Force requested that Delco provide a proposal to perform the required redesign of the fuel panel for a NTE price. On March 5, 1982, the Air Force issued Modification (Mod) P00002. Mod P00002 was an acceptance of Delco's offer to perform the change for a NTE price, and provided that the definitized price for the fuel panel change would not exceed $4,612,606 for the current contract quantity and $5,763,410 for the quantities of Option II and Option III, which were not yet exercised.

Mod P00002 authorized Delco to perform the complete fuel panel change including engineering design, procurement of parts, and production of the redesigned fuel panel, and committed the Air Force to pay Delco for the changed work up to the NTE price. Mod P00002 added $2,968,343 in funds to the contract and eliminated certain other contract requirements in the amount of $1,644,263, thereby providing that $4,612,606 was available to pay Delco for the fuel panel changes up to the NTE price for the then current quantity. Pursuant to Mod P00002, Delco and its subcontractors began design and engineering work on a modified fuel panel. From April 27, 1982 through May 4, 1982, Delco and the Air Force conducted a preliminary design review (PDR) of the entire FSA/CAS program. As part of the PDR, Gull presented the preliminary designs for the fuel panel as changed by Mod P00002.

The fuel panel to be provided under the FSA/CAS contract as originally awarded consisted of a single Line Replaceable Unit (LRU). This original single LRU fuel panel was a derivation of fuel quantity gauging units sold commercially by Gull for McDonnell Douglas DC–8 and MD–80 airliners. The original fuel panel contained a single microprocessor for computation of the aircraft center of gravity. The fuel management functions were not microprocessor controlled. Instead, the original fuel panel contained ten identical discrete circuit cards, each of which controlled the fuel management functions and information display for a single fuel tank on the aircraft. The reduced space in the cockpit pedestal

resulting from the relocation of the radar scope required that the microprocessor and associated circuitry needed for computation of the aircraft center of gravity be relocated to a second LRU denominated the Center of Gravity Control Unit (CGCU). Delco and the Air Force agreed that the CGCU would be located in the nose wheel well of the aircraft.

### C. *The Revised Fuel Panel Change*

In July 1982, it was determined that a further reduction in the size of the fuel panel was required in order to accommodate the wider throttle quadrant in the KC–135E ·version of the –135 aircraft. This change, among other things, required the relocation of equipment and the installation of additional sophisticated data transmission circuits. At a meeting on July 14, 1982, the Air Force selected a new layout for the Integrated Fuel Management Panel (IFMP) to accommodate the wider throttle quadrant. This second redesign has been referred to as the "revised fuel panel change."

As a result of the discovery of the wider throttle quadrant, the Air Force and Delco agreed that Mod P00002 would be deleted and a new modification issued encompassing all of the changes to the fuel panel. By telegram dated July 16, 1982, Delco proposed that Mod P00002 be cancelled and that a new unpriced modification to cover the revised fuel panel be issued for a total NTE price of $17,746,000.

The critical design review (CDR) for the FSA/CAS program was conducted from July 19–30, 1982. During discussions between Delco and the Air Force at the CDR, the Air Force agreed to reduce the maximum quantity of units to be delivered by Delco under the contract to 726. Based upon the reduction in quantity and certain other specified conditions, Delco proposed by telegram dated July 27, 1982 to perform the revised fuel panel change for a NTE price of $14,219,000. Delco's July 27, 1982 proposal expired without acceptance on July 28, 1982. *See Delco Electronics Corp. v. United States,* 12 Cl.Ct. 367 (1987).

By telegram dated August 10, 1982, Delco confirmed that sufficient funds remained unexpended from Mod P00002 to pay for the engineering design work for the revised fuel panel. Delco requested immediate direction from the contracting officer to begin the engineering design work utilizing the unexpired P00002 funds, extended its July 27 proposal and requested confirmation that a formal contract modification accepting the proposal would be issued by November 10, 1982.

By telegram dated August 12, 1982, the contracting officer directed Delco to proceed immediately with the engineering design work only for the revised fuel panel utilizing the unexpended P00002 funds. The contracting officer further stated that the contract modification for the complete revised fuel panel effort would be "forthcoming." The court determined that the contracting officer's August 12, 1982 telegram was not an acceptance of Delco's offer to perform the revised fuel panel change for a NTE price of $14.2 million. *Delco,* 12 Cl.Ct. at 371. As directed by the contracting officer, Delco and its subcontractors did proceed with the engineering design work for the revised fuel panel. In the absence of authorization other than for engineering design work, however, Delco personnel stated that they could not definitize any subcontract modifications with the subcontractors.

The Air Force did not issue a contract modification for the revised fuel panel change by November 10, 1982, and Delco's proposal to perform the revised fuel panel change for a NTE price of $14.2 million died unaccepted. On January 7, 1983, Delco submitted a new proposal to perform the revised fuel panel change for a NTE price of $16.7 million. By telegram dated January 10, 1983, the contracting officer rejected Delco's offer and asserted that, in the Air Force's view, the Air Force accepted the $14.2 million NTE offer.

On May 2, 1983, the contracting officer unilaterally issued Mod P00017. By its terms, Mod P00017 "superseded" Mod P00002. As part of Mod P00017, all of the funds available for performance of Mod

P00002 were transferred to Mod P00017. Mod P00017 also purported to unilaterally establish a NTE price for the change in the amount of $14,219,000. Delco rejected the contracting officer's effort in Mod P00017 to unilaterally establish a NTE price. Delco did treat Mod P00017 as direction to proceed with the complete change.

Efforts to settle the dispute were unsuccessful. The contracting officer issued her final decision and suit was filed in this court. The two-day trial on liability focused on the issue of whether the contracting officer accepted Delco's offer to perform the revised fuel panel change for a NTE price of $14.2 million. The court held that "[a]fter review of the entire record, the court finds that there was no acceptance of the plaintiff's NTE offer, and that the amount of the adjustment due the plaintiff is not limited to that amount [$14.2 million]." *Delco*, 12 Cl.Ct. at 368. Following additional discovery and a full round of audits, the second trial was held to establish the amount of Delco's equitable adjustment for the revised fuel panel change.

### D. The Effect of the Revised Fuel Panel Change on the FSA/CAS Subcontractors

Evidence submitted at the second trial established that the fuel panel developed in response to the initial fuel panel change required the use of every cubic inch of available space. The wider throttle quadrant resulted in a further reduction in the already limited space available for the fuel panel and necessitated a second complete redesign. Because of the discovery of the wider throttle quadrant in June 1982, the revised fuel panel design could not be completed in time for the CDR. Rather than delay the CDR in its entirety, the Air Force decided to proceed with the CDR as scheduled on July 19–30, 1982. The CDR included all aspects of the program other than the revised fuel panel, which would be reviewed at a second CDR in October 1982. Only preliminary sketches for the revised fuel panel were discussed at the July CDR.

The second CDR, which was limited to the revised fuel panel, was conducted on October 19–21, 1982. At this October 1982 CDR, the mechanical, electrical and software design of the revised fuel panel was presented by Gull and Delco, was reviewed in detail by the Air Force, and was approved. *Delco Electronics Corp. v. United States*, No. 97–86C at 2–3 (Claims Court July 25, 1988 Order limiting issues for trial).

Evidence was presented demonstrating that the fuel panel was changed in its entirety. What started as a straightforward derivative of an existing commercial product became a major development effort involving multiple microprocessors, extensive software development, multilayer flexible circuits, and miniaturization. A single unit became two, necessitating new communications circuitry and built-in-test capabilities to prevent corruption of data. Delco established at trial that the fuel panel changes rippled throughout the rest of the contract, necessitating changes in other hardware and software efforts, complicating the test and data requirements, and substantially delaying the entire program.

#### 1. Impact of the Change on Collins

Under its subcontract with Delco, Collins designed and manufactured the Bus System Interface Unit (BSIU) and Integrated Control and Display Unit (ICDU). According to the testimony of Delco FSA/CAS Subcontracting Manager James Kuczkowski and Delco FSA/CAS Program Manager Anthony Italiano, at the time of the revised fuel panel change, it was not possible to ascertain whether the change in the fuel panel would necessitate a change in the hardware being produced by Collins. It was therefore necessary to postpone production until it could be determined whether any changes to the Collins hardware would be required. Kuczkowski, Tr. at 96; Italiano, Tr. at 53–54. Ultimately, it was determined that the Collins hardware would not be changed as a result of the revised fuel panel change. As soon as this was determined, Delco directed Collins to continue with the production of hardware. Delco accepted from and paid Collins for

over three hundred sets of hardware. The revised fuel panel change resulted in a delay of approximately six months in Collins' manufacturing schedule. Changes to Collins' software were also required as a result of the revised fuel panel change. The costs of such software effort were apparently not charged to the government.

Collins originally proposed a price of $1.9 million for the impact of the revised fuel panel change. In February 1983, Delco conducted fact finding on the Collins proposal. In June 1983, following Delco's fact finding, and after the contracting officer issued Mod P00017, Collins submitted a new proposal to Delco in the amount of $1,093,042. On June 25–26, 1983, Delco negotiated with Collins based upon economic escalation factors for the labor and materials during the period in which Collins' manufacturing efforts were delayed. Kuczkowski, Tr. at 94–95. According to Kuczkowski's testimony, Delco fully analyzed the data supplied by Collins, and Collins personnel certified that the data furnished to Delco was current, accurate and complete. Kuczkowski, Tr. at 70.

The parties ultimately negotiated a subcontract price of $640,363 for the impact on Collins of the revised fuel panel change. The negotiated amount was formally added to the subcontract by amendment 8. Collins was paid the negotiated amount. The court heard the testimony of Erwin Williams of the Defense Contract Administrative Services (DCAS) and Ronald Beckstrom of the Defense Contract Audit Agency (DCAA) that the negotiations between Delco and Collins were conducted at arm's length. Beckstrom, Tr. at 1011; Williams, Tr. at 893–94. In its Exhibit B claim, Delco allocated general and administrative (G & A) costs and independent research and development/bid and proposal (IR & D/B & P) expense to the price negotiated with Collins claiming a total cost attributable to the Collins portion of the change in the amount of $709,585.

Williams, a DCAS price analyst, issued a price analysis report in December 1984. Defendant's Exhibit 209. The report analyzed Delco's July 1984 proposal to the Air Force, pursuant to Mod P00017. Delco's July 1984 proposal was presented to the Air Force after the change to the contract was negotiated with Collins. In the 1984 proposal, Delco requested on behalf of Collins a total of $832,017, including G & A, IR & D/B & P and profit. The Williams price analysis report did not question any of Delco's claimed costs for Collins and stated that "the costs as set forth [on behalf of Collins] ... are considered reasonable." Defendant's Exhibit 209 at 3, 8; Williams, Tr. at 892.

The court received evidence concerning Delco's negotiations with Collins questioning Delco's failure to obtain adequate pricing data. Audit report No. 3601–8C172467–S1, analyzing Delco's claims, was issued by the Milwaukee Branch Office of the DCAA on July 11, 1988 and was apparently prepared at the government's request for this litigation. Defendant's Exhibit 270 at 2. DCAA concluded that Collins' proposal was inadequately negotiated because Delco failed to obtain necessary cost and pricing data under Defense Acquisition Regulation (DAR) section 3–807.3. Id. at 6. DCAA concluded that it was impossible to determine whether Delco obtained a reasonable price because Delco did not receive adequate information. Id. at 7.

David Drascic, Supervisory Auditor at the Milwaukee Branch Office of DCAA, testified that, prior to the issuance of Audit Report No. 3601–8C172467–S1, he reviewed the back-up data Delco provided to DCAA regarding its claim on behalf of Collins. Drascic, Tr. at 1025. His purpose was to determine whether an audit could be performed with respect to the Collins claim. Drascic, Tr. at 1025–26. He determined that Collins did not provide Delco with sufficient cost information (such as material overhead, labor burden rates and G & A rates) in order for Delco to adequately negotiate a price for the change order. Drascic, Tr. at 1027–28, 1037–38. He incorporated these conclusions in the revised audit report. Drascic testified that, even though Delco indicated that "actuals" were used, this did not mean that Delco obtained the necessary cost data before negotiating the

change to the contract. Drascic, Tr. at 1035, 1041.

### 2. *Impact of the Change on ESI*

ESI was the "Group A" subcontractor for the FSA/CAS program. The "Group A" kits consisted of all brackets, hardware, wiring harnesses and similar equipment needed to install the components of the system into the various aircraft configurations. ESI's work was substantially changed as a result of the revised fuel panel change. ESI was required to remodel the mounting brackets and trays for the fuel panel. All of the cables for the equipment also required changes. ESI was required to provide additional mounting hardware for a new LRU—the Fuel Management Computer (FMC). Of particular importance was the necessity to design and build a new communications pathway between the IFMP and FMC and to protect that pathway from outside interference. ESI's task was apparently complicated by the requirement that the new equipment fit in various configurations of –135 aircraft.

ESI submitted a firm fixed price proposal to Delco by letter dated July 14, 1983 in the amount of $4,088,064.30. ESI submitted documentation to Delco in support of its claim. Kuczkowski testified that ESI provided cost and pricing data to Delco and certified that the data was current, accurate and complete. Kuczkowski, Tr. at 73. Delco conducted fact finding on ESI's costs. Following Delco's fact finding, ESI submitted to Delco a new, reduced proposal in the amount of $3,813,713.90.

Wade Herpin, a Dallas region DCAS engineer, conducted an analysis of ESI's July 1983 proposal to Delco and issued a Technical Analysis of Cost Proposal (Case No. 070–3–A03–112) on October 6, 1983. Defendant's Exhibit 140. Herpin found that much of ESI's proposed costs were reasonable but recommended a reduction in the manufacturing and labor hours. *Id.* at 5–7, Tables. Larry James, the DCAA auditor who conducted an analysis of the ESI proposal and relied upon Herpin's technical analysis to develop his audit findings, considered Herpin's work reliable. Defendant's Exhibit 308 at 30–32.

The DCAA Dallas Branch Office issued an audit report (Audit Report No. 1161–4I210083) on October 17, 1983, based upon an analysis of ESI's July 1983 firm fixed price proposal (83–JMH–6980) to Delco. Defendant's Exhibit 141. The audit report questioned ESI's claimed costs for material because of mistakes made in defining which parts should have been included in the change order. DCAA also questioned direct labor and overhead costs, based on the findings of Herpin's technical report and on problems ESI had with projecting its direct and indirect labor rates. The report questioned a total of $1,955,549 of ESI's proposed costs. *Id.* at 5, 6–8.

On December 21, 1983, Delco and ESI met at Delco's facility and negotiated the price of ESI's adjustment for Mod P00017. The Delco negotiation team consisted of eight persons and included three engineers. The parties ultimately negotiated a price of $3,477,273 for the ESI portion of the revised fuel panel change. The negotiated amount was formally added to the subcontract by amendments 9 and 10.

After the DCAA audited ESI's July 15, 1983 proposed costs, ESI revised its proposal. The proposal which was audited by DCAA was not the proposal which formed the basis of the negotiations with Delco. A follow-up audit of ESI's revised proposal apparently was not conducted. According to the testimony of Kuczkowski, Delco did not obtain a copy of the 1983 audit until 1985. He stated that Delco's negotiations with ESI would not have been affected had the report been received prior to the negotiations. Kuczkowski, Tr. at 75–77.

Robert J. Plaster, Delco's Subcontract Administrator, testified that in 1985 it was necessary to negotiate an additional adjustment with ESI to compensate for additional schedule extensions resulting from the revised fuel panel change. Plaster, Tr. at 703–06. On February 14, 1985, ESI proposed a price of $476,990.16 for this delay. Delco conducted fact finding on this amount and negotiated a price of $304,665 for this additional delay. This amount was included in amendment 11 to the subcontract.

The testimony of the government's auditors, Williams and Beckstrom, indicates that they believed that the negotiations between Delco and ESI were conducted at arm's length. Williams, Tr. at 893–94; Beckstrom, Tr. at 1011. Delco paid the negotiated amounts to ESI. In preparing its Exhibit C claim, Delco also allocated G & A and IR & D/B & P to the price negotiated with ESI, claiming a total cost attributable to the ESI portion of the change of $4,155,698.

The DCAA Milwaukee Branch office also audited Delco's claim on behalf of ESI in 1988. Defendant's Exhibit 270. DCAA reviewed the subcontract files and documentation regarding the ESI negotiations and interviewed the personnel involved. *Id.* at 8. The auditor once again concluded that Delco's negotiations with ESI were not satisfactory because Delco did not adequately evaluate ESI's books and records to determine the accuracy of ESI's labor, overhead, G & A, or Cost Accounting Standard (CAS) rates. *Id.* As a result, DCAA questioned the difference between the amount accepted by the DCAA Dallas Branch Office and the amount Delco claimed. This amount included the $304,665 adjustment that ESI and Delco negotiated in June 1985, because Delco did not adequately obtain supporting data. Beckstrom, Tr. 975, 978–79. DCAA in 1988 asserted that Delco lacked the necessary pricing information when it negotiated the contract adjustment. Beckstrom, Tr. at 976, 1016–17.

### 3. *Impact of the Change on Gull*

On December 15, 1981, Delco issued a subcontract to Gull, Inc. to deliver fuel panels, TIUs and RDUs for inclusion with other equipment to be provided by Delco under the FSA/CAS contract. Gull is a manufacturer and supplier of fuel measurement and related systems to the commercial airlines and to the military. According to Delco's witnesses, Gull's experience was a major criterion in its selection as a source by Delco and in its approval by the government. Jasper Patterson, the government's Program Engineer, considered Gull one of the two companies capable of building the required equipment. Defendant's Exhibit 307 at 19 (Patterson Depo. Tr.).

Prior to subcontract formation, Gull submitted a technical proposal and a price proposal in five volumes as part of the Delco team proposal. The technical proposal set forth the designs and circuits intended to be used in the product and was incorporated into the subcontract. The designs and circuits proposed by Gull were derived from Gull products delivered in quantity in the past. The design was an adaptation of equipment Gull was already producing. For example, tank processing circuits and the "no adjust" feature of the IFM/CGS were taken from an existing fuel gauge indicator.

Delco presented impressive testimony and exhibits at trial concerning the technical aspects of the Gull portion of the FSA/CAS contract before and after the changes. The original design for the IFM/CGS was a single enclosure to be mounted in the top of the pedestal of the –135 series airframe cockpit between the two pilot seats of the aircraft. The IFM/CGS was to be used for fuel management and fuel measurement. Functions of the IFM/CGS were divided into mission critical ("fail-safe") functions and non-mission critical. Mission critical functions affect the safe operation of the aircraft and include the display of fuel quantity in pounds remaining in each tank; the capability to transfer fuel to the engines, refueling boom, and between the fuel tanks by the activation of valve and pump switches; and the ability to dump fuel.

A failure of non-mission critical functions would not jeopardize safe operation of the aircraft even if one or more of those functions were inoperative. These functions include the display of the aircraft's center of gravity as it changes with the movement of fuel and load; the amount of fuel transferred through the refueling boom; and the total fuel remaining in all tanks. During the trial, Gull's Chief Program Engineer Ira Rubel, described these functions using Gull's proposal, Plaintiff's Exhibit 62, and a mockup of the IFM/CGS as pro-

posed and subcontracted for. Plaintiff's Exhibit 88; Rubel, Tr. at 266–84.

The TIU was to be interconnected between the wiring from the probes in as many as ten aircraft fuel tanks and the IFM/CGS. The TIU was to be mounted within two feet of the IFM/CGS in the same pedestal. This distance limit was necessary for the TIU to benefit from the electro-magnetic protection built into the IFM/CGS. The fail-safe functions for each IFM/CGS were to be contained in ten identical printed circuit (PC) cards, using a "brick wall" approach. Any defect in one fuel measurement board would be electrically and mechanically isolated from all the others to assure fail-safe functions. The cards were merely a repackaging of an existing design employed on DC–8 and other aircraft as illustrated by Plaintiff's Exhibit 163, a pre-existing DC–8 fuel quantity indicator.

A single "host microprocessor" PC card consisting of a computer and related software was intended to perform all the non-critical functions. These computations could fail in flight without causing the mission to abort. This microprocessor PC card was similar to designs delivered by Gull in the past as part of the MD80 fuel quantity system and Boeing 747 limit indicators. Three additional PC cards contained the power supply circuitry, transformers for the other functional cards, and the 1553 RT Bus. The PC cards were of relatively standard configuration and were derivative of existing indicators such as the DC–8 fuel quantity indicator. The transformers were identical to those in the DC–8 fuel indicator. The filtering for the power supply used a linear voltage regulator with rectification, also present in the DC–8 fuel indicator. The built-in-test (BIT) circuitry and digital PC card for the 1553 RT Bus were also in the DC–8 fuel indicator. There was also a spare card.

Gull's price proposal was developed by a team of electrical, mechanical and manufacturing engineers and managers. The court heard the testimony of Rubel, David Murray, Gull's Program Manager and Sal Catania, Gull's Mechanical Engineering Manag-

er, concerning the pricing method used by Gull. Their testimony established that a bill of materials for the entire quantity required by the subcontract was prepared which was based upon experience with prior existing designs. Labor hours based on experience with prior projects were also calculated. Rubel, Tr. at 261–63, 300–02, 357–58, 362; Murray, Tr. at 140–41, 144–48; Catania, Tr. at 371–73, 376–89. Gull "based the cost for that [the proposed] system on previous experience and proven designs." Rubel, Tr. at 339.

The materials were then priced by Gull's purchasing department and labor rates and burdens were applied to the labor hours by the accounting department. The entire process was recorded in a cost backup maintained by Gull. Plaintiff's Exhibit 63. The subcontract prices for each contract line item number (CLIN) were derived from the cost backup. Prices from the work papers were apparently reflected directly in the cost proposal. Delco's Italiano testified that Delco reviewed Gull's proposed price, compared the proposed price to internal Delco estimates and found it reasonable. Italiano, Tr. at 43–44, 60–61.

The original designs for the IFM/CGS and TIU were never used because of the series of changes made by the Air Force beginning less than a month after subcontract award. The Air Force proved itself to be a fickle customer. The changes it imposed on Delco resulted in a huge cost impact throughout the entire FSA/CAS program. Gull was the subcontractor most severely affected. The changes began in January 1982 when the radar scope location change to the pedestal was imposed, followed shortly thereafter in June 1982 by the change necessitated by the throttle quadrant interference. The original design was discarded early in subcontract performance, and no significant effort was ever made to implement the original contract requirements. The Gull LRU was severely affected by the restrictions in pedestal location resulting from the change in placement of the radar scope to the top center of the pedestal, and by the discovery of the throttle quadrant interference present in some versions of the KC–135

aircraft. At the October 1982 CDR, Gull presented and the government approved an entirely new design concept, one that apparently was never before used or applied, to perform the identical functions originally required by the contract, subcontract and specifications.

The plaintiff's witnesses and exhibits established at trial that for all practical purposes nothing remained of the original design which was completely discarded in the presentation at the CDR in October 1982. A complete redesign was made necessary by the pedestal location changes required by the Air Force. Because the location changes began in January 1982, within 30 days of award of the subcontract, Gull did not have a chance to implement the original design. Rubel, Tr. at 320–23.

As a result of the revised fuel panel change, the IFM/CGS was divided into two housings—the IFMP and the FMC. The FMC was located in the nose wheel well of the aircraft and was connected by hard wiring to the IFMP in the pedestal. The IFMP remained in the pedestal but at its base; it was now deeper, wider and shorter than the original single housing design IFM/CGS. In its new location, the presence of a speed brake control cable necessitated the bifurcation of the IFMP housing. Functional elements were located on each side of the divided housing, each of which was connected to the gauges and switches on the IFMP face.

Signals received from the TIU were analog. It became necessary to convert these to digital along with all other analog functions in the FMC. Fail-safe and non-mission critical functions were performed by microprocessors and related software. The "brick-wall" approach was lost. Fail-safe functions were achieved by four microprocessors, two of which were the Primary Microprocessor (PUP) and the Redundant Microprocessor (RUP) in the FMC. Should there be a failure of the PUP circuits, the RUP would take over. The digital signals issued by the PUP/RUP were transmitted to the IFMP where they were processed into the digital display on the face of the IFMP. Two other microprocessors per-formed these display functions—the Primary Display Microprocessor (DPUP) which was backed up by the Redundant Display Microprocessor (DRUP). Each of the four microprocessors required associated software.

According to the testimony of Gull's Rubel, the quantity of circuitry increased substantially to accommodate the four microprocessors, to intercommunicate between the FMC and the IFMP, and to intercommunicate between the two sections of the IFMP. Special devices denoted "W1 and W2 flexes" were developed that advanced the state of the art for such intracommunications. Rubel, Tr. at 315–18, 411–13. Each flex consisted of as many as 32 layers of hundreds of wires in four thin plastic covers encompassing up to 1500 input/output connections and 10,000 individual solder joints. In addition to the complexity introduced by the W1 and W2 flexes, Gull was required to develop vapor phase soldering techniques to allow for the production assembly process.

The original design consisted of fourteen PC cards, plus one spare per unit, of five different configurations. The revised fuel panel change required seventeen boards of twelve different configurations, eight boards in the IFMP, and nine boards in the FMC. The complexity of the PC cards increased from two layers to multi-layers, and the area factor of components on the boards was reduced from .75 square inches to .55 square inches density—a more dense packaging. To accommodate all this new circuitry, the volume of the housings grew from 901 cubic inches to 2573 cubic inches. The sheet metal construction of the enclosure of the FMC applied principles of construction similar to that intended for the original IFM/CGS. However, the new IFMP was a combination of 18 cantilevered weldments supported by an intercostal plate to the front panel. In effect, the IFMP consisted of two separate electrical modules mechanically joined. The changed design also mandated that the TIU be moved to the aircraft nose electronic bay within two feet of the FMC. The TIU was substantially changed as a result of the move. The aircraft cabling was different

at the new location, thereby necessitating an additional connector, a PC card, fixed capacitors, additional circuitry and a safety cover.

The RDU was not directly related to the functions of the IFMP, FMC or TIU, and was unaffected by the changes except that its manufacture and delivery as part of the LRU "kits" were delayed. Like the other parts of the proposed system, the RDU was originally offered as a derivation of a prior design. Gull's Murray stated that the actual costs of fabrication were lower than anticipated by Gull's cost proposal at subcontract inception by more than $400 per unit. Murray, Tr. at 182–84.

Plaintiff's witnesses established that the original project anticipated a production run of LRUs derivative of standard Gull designs using standard Gull production techniques. Instead, Gull was confronted by a design and development program that included advancements in state of the art technology and the development of new highly sophisticated production techniques. The program was accomplished in parallel with the obligation to produce a large quantity of the developed products for installation in operational aircraft. The change also impacted support efforts such as flight testing. Problems arose from the new design that would not have arisen in the proven original design. Kuczkowski, Tr. at 625–26, 685–86; Schweitzer, Tr. at 729, 1347–48; Rubel, Tr. at 773; Murray, Tr. at 858–63.

The defendant attempted to show that Gull was responsible for delays in the FSA/CAS program that created a cost impact which should not be attributed to the government. The defendant attacked Gull's design solutions even though it acknowledged that the changes imposed by the Air Force required Gull to develop designs at or beyond current state of the art technology. Evidence was introduced purporting to establish that Gull's solution to a noise filtering problem in the tank unit input lines causing the distortion of data was faulty. Rubel, Tr. at 750–52; Partridge, Tr. at 927–28; Defendant's Exhibit 93. The government also questioned Gull's

approach in designing circuitry correctly in the development of a prototype. Defendant's Exhibits, 306 at 130–31 (Farmer Depo. Tr.); 307 at 129–30 (Patterson Depo. Tr.).

The defendant presented evidence on the existence of management problems at Gull allegedly unrelated to the revised fuel panel change that caused substantial delays in the program and which imposed costs on Delco and its other subcontractors. The government identified management difficulties that included: Problems Gull experienced in developing and delivering hardware to Delco, Italiano, Tr. at 601; Gull's failure to apply adequate manpower to the program, as expressed by Delco in a June 9, 1983 management meeting held between Gull and Delco, Defendant's Exhibit 110 at 1; and lack of adequate communication between Gull's electrical and mechanical engineers. *Id.* The defendant also presented evidence concerning a lack of commitment by Gull management to perform in a timely manner, Defendant's Exhibit 172; and steps proposed and taken by Delco to resolve these problems. Defendant's Exhibits 179, 286, Kuczkowski, Tr. at 642.

The court received evidence concerning Gull's attempts to segregate costs associated with the changes. In a DCAA audit of Gull's final cost proposal, Q13490 Rev. E, conducted by the DCAA Suffolk County Branch in 1988, the DCAA found that it could not adequately verify Gull's costs because Gull failed to segregate its costs for the change. Defendant's Exhibit 268 at 2, 7. Like the other audits prepared in 1988, the report acknowledged that the audit was conducted at the request of the government after litigation of the damages question commenced. *Id.* at 2. In response to the allegation concerning the failure to segregate costs, Gull employees stated that they segregated costs where possible, but could not do so where nothing remained of the work originally anticipated. Murray, Tr. at 221; Berke, Tr. at 826–27.

By June 1984, prototype units and a portion of the first production quantity were delivered or were in process. Gull employ

ees stated that they believed they were able to estimate the cost of the new project with accuracy, having gained some experience with the actual hours and quantity of material. Rubel, Tr. at 362; Murray, Tr. at 157–59, 857, 863–65. Gull submitted to Delco Q13490, a detailed application for an equitable price adjustment for $22 million for the new design made necessary by the pedestal location changes. DCAA performed an assist audit of the "B" revision of Q13490 and disagreed with approximately $3,000,000 of Gull's proposed adjustment. Plaintiff's Exhibit 98 at 5–6.

In November 1984, Delco and Gull negotiated purchase order amendment 23 to the Gull subcontract. That amendment incorporated Gull's latest proposed price of $17.7 million as a NTE price for the change, thereby preventing any additional escalation. Plaintiff's Exhibit 90 at 2. By amendment 23, Delco also agreed to continue progress payments to Gull based on the NTE price in order to finance the continued engineering and production efforts. Finally, amendment 23 provided a mechanism for definitizing the price for the change. The amendment made Gull a "partner" of Delco for the purpose of negotiating a price with the Air Force. In the event negotiations were unsuccessful, Gull would participate and present its own costs in any litigation. The definitized price for the Gull effort would be the price determined in those negotiations or litigation, and the subcontract price would be adjusted accordingly.

On May 24, 1985, Delco and Gull commenced negotiations to agree on the quantum of the equitable price adjustment. Plaintiff based its negotiations on Gull's estimates and its own fact-finding efforts. Kuczkowski testified that there were differences of opinion as to whether the estimates accurately reflected ultimate project costs to Gull. Kuczkowski, Tr. at 81, 675. For example, Gull disagreed with the application of Delco's labor hour standards to a company of Gull's size and experience. Delco and Gull negotiated over an equitable adjustment until a ceiling of $17,700,293 was reached. Plaintiff's Exhibit 148; Kuczkowski, Tr. at 675–81, 687–88.

At trial, Delco's Kuczkowski stated that in his opinion, but for the ceiling, Gull would be entitled to an adjustment greater than $17,700,293. Kuczkowski, Tr. at 83–84. In May 1985, Delco was informed that the Air Force intended to litigate the equitable adjustment for the revised fuel panel change. Delco discontinued further negotiations with Gull on the amount of equitable price adjustment.

During the pendency of these proceedings, the subcontract was completed. Approximately 725 kits were delivered by Gull and Delco, and many were installed in aircraft. On July 8, 1987, Gull submitted to Delco Revision E to Q13490—its final revised application for equitable price adjustment, which was based on costs to June 30, 1987 and an estimate to complete. Plaintiff's Exhibit 66. The proposal purportedly eliminated costs resulting from a nine month delay caused by a fire in the plant of a supplier of key components pacing Gull's performance; costs of spare LRUs; retrofit and disruption costs of parallel instead of series production; costs of an order placed after amendment 23 and unaffected by the change; and other costs which are the subject of separate review between Delco and Gull.

Gull stated that the following costs were incurred as a result of the changes. The total actual costs in performing the changed project were $46,705,822. The removal of $10,557,935 in unrelated costs left a modified total cost of $36,147,887 attributable to the subcontract as changed. From this amount, the original subcontract costs (as of subcontract amendment 19) of $15,314,702 were subtracted. Total actual costs of the change, Gull stated, were $20,883,183, approximately $3 million more than the NTE price established in amendment 23.

The defendant presented evidence attempting to show that Delco failed to mitigate damages with respect to the work performed by Gull after the changes, and that Gull's claimed costs are unreasonable. In particular, the defendant challenges the negotiation of Gull's $17.7 million NTE price for the revised fuel panel change

claiming it was not conducted reasonably. The government's arguments concerning the reasonableness of the Gull $17.7 million NTE price relate to the negotiations between Gull and Delco during the time prior to Gull's final Q13490 price proposal. Revision E of that proposal forms the basis of Delco's current claim. Plaintiff's Exhibit 66.

With the technical participation of DCASR Engineer Louis Spector, DCAA Suffolk County Branch performed an assist audit of Q13490 Rev. E in June 1988. The DCAA and DCASR reviewers were critical of Gull's accounting system and the failure to segregate costs. Although they stated that their evaluation was "high level" and "qualified," they nonetheless determined that all the costs claimed by Gull were "allocable" to the program and "reasonable" in amount, after costs questioned by the technical reviewer were deleted. Plaintiff's Exhibit 96 at 3, 5–19; Plaintiff's Exhibit 97 at 2; Plaintiff's Exhibit 186 at 70, 71 (Nixon Depo. Tr.); Plaintiff's Exhibit 187 at 36, 76–77, 96–97, 111 (Spector Depo. Tr.).

The government did not contest any of the labor rates, overhead rates, or G & A rates used by Gull in the preparation of Q13490 Rev. E. The audit report questioned only $1,289,284 of Gull's $23,751,364 costs based on the technical review. Plaintiff's Exhibit 97 at 2. After further review, the technical auditor reduced the hours questioned prompting a reduction in questioned cost to approximately $950,000. Plaintiff's Exhibit 91 at 8–9, 18; Plaintiff's Exhibit 187 at 53–54 (Spector Depo. Tr.). The technical reviewer, in his report, wrote that "[a]dditional fact finding will be continued and reported on if clarification or different conclusions are revealed in the fact finding." Plaintiff's Exhibit 96 at 3–4. Except for the changes to the report described above, the report was not revised.

The DCAA, DCASR assist audit team received Gull's original technical and cost proposal for the purpose of reviewing the original price. Plaintiff's Exhibit 187 at 84–85 (Spector Depo. Tr.). No challenge to the original price to perform the original unchanged contract was raised. The government's technical reviewer evaluated Gull's original cost and technical proposal for reasonableness and took no exception to either. *Id.;* Plaintiff's Exhibit 96 at 3, 5–19. David Drascic, the DCAA supervisory auditor from Milwaukee, who prepared the government's July 1988 audit, also acknowledged that there was nothing in the DCAA files or reports to indicate Gull's original price was not reasonable. Drascic, Tr. at 1072.

E. *Effect of the Revised Fuel Panel Change on Delco*

1. *Engineering Costs*

As prime contractor and system integrator, Delco had substantial responsibility for all aspects of the FSA/CAS program including the fuel panel. Delco's efforts were divided between its Santa Barbara and Milwaukee facilities. According to Delco's witnesses, as a result of the revised fuel panel change, the amount of work performed by Delco was substantially increased at both locations. Italiano, Tr. at 501–05, 540–41; Schweitzer, Tr. at 435, 452, 456–57. In response to the government's charge that Delco failed to segregate costs, Delco's witnesses stated that cost segregation was not feasible because the definition of the work was not changed, only increased in amount. Italiano, Tr. at 506–07; Schweitzer, Tr. at 452–57, 467–69, 480–81.

Delco's claimed costs as set forth in Exhibits A and G were based on estimates of the increased labor hours and were prepared by engineers and program managers knowledgeable about the changes. The estimators identified the impact of the change on the various aspects of the program and estimated the increased effort resulting from the changes. Delco's claimed costs for this increased work, including added G & A and IR & D/B & P, are $1,929,701 for Santa Barbara, and $1,692,982 for Milwaukee.

The DCAA Santa Barbara Branch office evaluated Exhibit A of Delco's claim in 1988 and recommended that Delco not be compensated for any costs because its claim was unsupported. Defendant's Ex-

hibit 272 at 9 n. 1(a), 10 n. 2, 11 n. 3(a). According to DCAA Santa Barbara auditor Katherine Karnes, when DCAA auditors questioned Delco personnel who developed the estimates about how they reached their conclusions, they could not correlate the percentages Delco supposedly relied on to project their costs with the amount claimed. Karnes, Tr. at 1107–09. In addition, DCAA was dissatisfied because Delco personnel did not develop a work order analysis, a method contractors can use to justify their selection of which work orders were impacted by a change and how they were impacted. Karnes, Tr. at 1110.

The DCAA auditor questioned all of Delco's claimed costs in Exhibit A because Delco was found to lack the following:

(1) Rationale or analyses used to determine the particular work orders impacted by P00017;

(2) Rationale or analyses used to determine the number of man hours, man months, or costs attributable to P00017 for each of the allegedly involved work orders;

(3) Rationale, analyses, and complete computations used to support the judgmentally estimated percentages; and

(4) Rationale or analyses used to determine the allocable number of labor hours for each labor skill category.

Defendant's Exhibit 272 at 9 n. 1(a).

The government also contests Delco's claims because it relied on plant-wide labor rates, which may not necessarily represent wages paid by Delco for its employees to perform the changed work. Aldinger, Tr. at 1159–61. According to the government's witnesses, Delco's claim should also be disallowed because it failed to segregate costs, even though it had the capability of doing so. Aldinger, Tr. at 1225–27; Schweitzer, Tr. at 452. In addition, the government states that Delco's claim is flawed because it failed to document meetings and the bases of its estimates for the changes. Aldinger, Tr. at 1236.

Jerry M. Thompson, a DCASR engineer, submitted a technical report to DCAA on May 13, 1988 based upon his review of Delco's Exhibit A claim. Defendant's Ex-

hibit 272 at App. 2. The report relied on the conclusions of an August 27, 1984 DCASR report written by Mark M. Smith, based on Delco's claim submitted to the Air Force in 1984. Smith concluded that Delco did not supply adequate supporting data to back up its P00017 costs. However, Thompson's report reached a conclusion favorable to Delco, stating that "[t]he methodology used is considered appropriate and adequate." The DCAA auditors in 1988 actually questioned the validity of Thompson's report because Thompson gave no opinion as to the reasonableness of the costs because of the lack of support, and because Thompson did not rely on adequate information. Defendant's Exhibit 272 at 3 ¶ 3(b); Karnes, Tr. at 1148–52.

The government's position with respect to Exhibit G of Delco's claim for the Milwaukee effort is the same. It alleges that the costs claimed therein should be disallowed because they are inadequately supported. The defendant provided evidence on the method relied on by Delco to estimate its Exhibit G costs. Apparently, the impact of the changes was merely estimated on a blackboard and then transferred to form 602 computer data input sheets, after which the information developed on the blackboard was erased with no one at the meeting keeping any notes. Italiano, Tr. at 505; Karnes, Tr. at 1122. The documentation relied on by Delco was based on the 602 forms. The DCAA also audited Delco's Exhibit G claim in 1988 and questioned all of the costs because the DCAA concluded that Delco failed to provide adequate support. Defendant's Exhibit 272 at 9 n. 1(c), 11 n. 3(c); Aldinger, Tr. at 1168.

2. *FSAS Manufacturing Schedule*

As a result of the revised fuel panel change, Delco's manufacturing schedule for the FSAS computers and spares was extended. While the fuel panel was being redesigned, Delco held up manufacture of the FSAS computer in order to determine whether any hardware changes would be necessary, particularly in the area of built-in-test circuitry. Italiano, Tr. at 485–87, 499, 519–21. According to Italiano, this delay moved the manufacture of FSAS out

of the period established on Delco's master factory schedule causing interference with other manufacturing programs and inefficiencies. Italiano, Tr. at 492–94. The government's inconsistent directions to proceed on a series or parallel production schedule also resulted in further inefficiencies. Italiano, Tr. at 489–91.

Italiano testified that these schedule extensions resulted in higher costs because Delco's rates were higher during the period of actual manufacture than they were when manufacturing was originally scheduled to occur. Italiano, Tr. at 485. The design of the equipment itself was not changed. Italiano stated that Delco attempted to minimize the impact of the schedule extensions by releasing pieces of the computer for production as soon as it was confident that the configuration of the component would not be changed. Italiano, Tr. at 483–87, 499, 519–21, 524.

Exhibits E, F and E–1 list the costs in Delco's claim resulting from this schedule extension. Exhibit F reflects the manufacturing labor hours and material costs for the FSAS computer designed and built by Delco as priced in the FSA/CAS contract as awarded, using the rates applicable to the periods of performance specified in the original contract schedule. Exhibit E reflects the same manufacturing hours and material costs as shown in Exhibit F, repriced using rates applicable to the actual period of performance. The difference in the two amounts, exclusive of profit, is $1,957,414. Plaintiff's Exhibits 171, 172, 166 at Tabs E & F.

Regarding these schedule delay claims, however, the defendant points out that Italiano stated that the delivery schedule relied upon did not necessarily reflect the actual production schedule of the FSAS computers. Italiano, Tr. at 519. He also stated that he could not determine how long it actually took to build the computers and that he could not precisely determine the actual assembly schedule for the computers because various parts were built at different times. Italiano, Tr. at 1339, 1343.

When the 1988 DCAA Milwaukee Branch Office audit report was issued, DCAA did not question Delco's claim for delay costs. Beckstrom, Tr. at 1014. Afterward, however, Drascic, the Milwaukee Supervisor, concluded that Delco should not receive an adjustment for delay, reasoning that Delco had continued to receive progress payments even though it was not delivering any FSAS computers. Drascic stated that it was his opinion that because Delco was paid for its work on the FSAS computers at the time it incurred its costs, Delco did not suffer any loss from the slip in delivery schedule. Drascic, Tr. at 1029, 1057–59.

### 3. *FSAS Spares*

The revised fuel panel change also extended Delco's production of certain spare equipment required under the contract. The direct costs resulting from this schedule impact, $222,464, are shown in Exhibit E–1 of the claim. The same methodology was used to compute these costs as was used to compute the costs in Exhibits E and F, explained above.

The government questioned Delco's claimed costs for FSAS spares for the same reasons it questioned the costs claimed for FSAS manufacturing delay—because Delco has not shown that the extension of delivery date, as opposed to manufacture date, actually caused Delco to incur increased costs. In this regard, the DCAA Milwaukee concluded that it could not assess the impact of the revised fuel panel change on the production of FSAS spares because Delco did not provide sufficient data for such an assessment. Defendant's Exhibit 270 at 14 n. 4(a); Beckstrom, Tr. at 980.

### 4. *EMPAT*

The FSA/CAS contract required Delco to design and manufacture 57 Electromagnetic Pulse Assembly Tester (EMPAT) units. EMPAT equipment is used to test electronic equipment for susceptibility to damage from the electromagnetic pulse resulting from a nuclear explosion. As a result of the revised fuel panel change, Delco was required to modify the EMPAT design to provide test capability for one additional LRU—the FMC. Delco was also required to revise the electronic circuitry to add a programmable read only memory chip, and to design and build a new interface har-

ness. Delco incurred actual material costs of $32,439 for the EMPAT changes. These costs were apparently taken from actual purchase orders and were not estimated. Italiano, Tr. at 1340. Exhibit E–2 lists the EMPAT costs resulting from the revised fuel panel change. Delco claims that it is entitled to G & A and IR & D on this amount for a total of $34,739.

The government attempted to show that Delco's claim for these costs was unwarranted because Delco failed to provide adequate supporting data. In particular, as a result of its 1988 audit, the DCAA Milwaukee Branch Office questioned Delco's claimed material costs for EMPAT because a part listed on the materials bill had been deleted, and because materials were priced in 1987 prices which had actually been manufactured in 1983. Beckstrom, Tr. at 984–86. The DCAA also took exception to Delco's labor and burden costs because the labor performed for the EMPAT changes was completed by a service department which, under Delco's accounting system, was also charged as an indirect labor cost. According to the government, this may amount to impermissible double charging. Beckstrom, Tr. at 985–86; Defendant's Exhibit 270 at 12–15.

### 5. *Technical Support for Gull*

During the period between September 1983 and February 1986, Delco provided technical support at Gull's facility to assist Gull in addressing technical production problems arising from the revised fuel panel change. This effort was separately identified and collected under a specific work order. Italiano, Tr. at 545–47. The costs claimed by Delco were actual incurred costs, and not estimates. Italiano, Tr. at 516–17; Karnes, Tr. at 1128. This effort apparently would not have been necessary in the absence of the revised fuel panel change. Italiano, Tr. at 516. Delco listed the cost of this effort in Exhibit H of its claim. Adding in labor, travel, G & A and IR & D costs, Delco's Exhibit H claim totals $199,720 for the Gull support effort.

The government's auditors admitted at trial that the costs claimed for this effort were not unreasonable, were allocable to the revised fuel panel change, and were not otherwise unallowable. Karnes, Tr. at 1128. Plaintiff's Exhibit 119 at 31–31b. The defendant argues, however, that the need for technical support at Gull was caused by Gull's alleged extraordinary management problems, which were identified by Delco, and therefore should not be charged to the government. Defendant's Exhibits 179, 190, 237, 286.

### 6. *Other Items Claimed*

Exhibit K to Delco's claim sets forth costs incurred by Delco for its current and former employees engaged in quantifying Delco's equitable adjustment. According to Delco, the costs include effort of the current and former employees in responding to requests of DCAA auditors, and in attending depositions and trials in this case, in part, as government witnesses. The DCAA Santa Barbara office, however, determined that time charged by Delco for its consultants, Italiano and Kuczkowski, was for the litigation of this claim, and should not be allowed in accordance with DAR section 15–205.31(d). Karnes, Tr. at 1129–31.

In Exhibit I of its updated claim, Delco credits the government with $141,096 for the deleted Interim Contractor Support (ICS) effort. In Exhibit J of its claim, Delco also credited the government with $2,497,697 for the reduction from level three to level two Organic Maintenance Concept. The government agrees that these credits are appropriate in amount and does not otherwise dispute them.

Delco updated its claim at trial to reflect its most current labor and overhead rates, and recalculated its claim using these rates. The DCAA auditors did not question the G & A or IR & D/B & P rates that were applied by Delco to the subcontract costs. Aldinger, Tr. at 1231; Karnes, Tr. at 1139. With respect to Delco's costs in Exhibits A and G, DCAA Santa Barbara auditor Karnes calculated a rate-based disallowance of approximately $12,000 for Exhibit A and $23,000 for Exhibit G. Karnes, Tr. at 1139–41. These calculations were not based on a determination that Delco's rates were overstated, but on an arbitrary

reduction in the rates used by Delco. Karnes, Tr. at 1141. The calculations were in any event superseded by the update.

Finally, Delco claims $127,389 as cost of money (COM) expense for the cost of facilities capital, and $3,624,652 in profit, given weighted risk factors, at a rate of 12%. The defendant would have the court deny the COM claim because it contends that the underlying base costs to which COM is allocated should be disallowed. The defendant argues that Delco is only entitled to a low to mid-range level of profit, which it asserts is approximately 6% or 7%.

### F. *Summary of the Claims*

Totaling all the exhibits of its claim, Delco contends that it is entitled to a total equitable adjustment of $31,541,149. The defendant asserts that Delco is not entitled to recover any of its own costs and would thus have the court award nothing for the claims listed in Exhibits A, E, E1, E2, F, G, and H. According to the defendant, these claims should be disallowed because Delco failed to provide adequate support. The defendant also argues that Delco's Exhibit K litigation costs are unallowable.

With respect to the FSA/CAS subcontractors, the defendant argues that Delco can recover nothing for Exhibit B, the Collins effort, because it failed to obtain adequate cost and pricing data for the negotiations. The defendant would limit Delco's Exhibit C recovery on behalf of ESI to $1.85 million for the same reason. Delco's recovery on behalf of Gull, according to the defendant, should be limited to $8.2 million because of Gull mismanagement, Delco's failure to mitigate, and because of unallocable delays. Subtracting the $2.64 million in undisputed credits from this $10.05 million in admitted costs and adding in the defendant's proposed profit of 6% or 7%, would result in a total equitable adjustment conceded by the government of approximately $7.93 million. Taking into account the fact that Delco has already been paid $14.2 million, the government requests that the court order Delco to remit the difference.

## DISCUSSION

### I. *The Legal Framework of Equitable Adjustment Claims*

A brief overview of the law governing equitable adjustment claims will provide a helpful point of departure. This was a complex case and the legal framework within which the court must determine the validity of each element of the plaintiff's claim should be clarified.

### A. *Burden of Proof*

■■■■ The burden for establishing the amount of a total equitable adjustment is allocated to the party claiming the benefit of the adjustment, in this case, Delco. In fulfilling this burden of proof, the party must establish both the reasonableness of the costs claimed and their causal connection to the event on which the claim is based. *S.W. Electronics & Manufacturing Corporation*, ASBCA Nos. 20698, 20860, 77–2 B.C.A. ¶ 12,631 at 61,218 (1977), *aff'd*, 228 Ct.Cl. 333, 655 F.2d 1078 (1981). As in other civil actions, the standard used to determine whether the burden has been met is the "preponderance of the evidence" test. *See Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 421, 587 F.2d 472, 479 (1978); *Vulcan Rail & Construction Co. v. United States*, 158 Ct.Cl. 234, 241–42 (1962).

In *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956 (1965), the Court of Claims stated that a contractor's burden of proof is satisfied where a reasonable basis for computation of the amount is established. The court elaborated that:

A claimant need not prove his damages with absolute certainty or mathematical exactitude. It is sufficient if he furnishes the court with a reasonable basis for computation, even though the result is only approximate. Yet this leniency as to the actual mechanics of computation does not relieve the contractor of his essential burden of establishing the fundamental facts of liability, causation, and resultant injury.

*Id.,* 173 Ct.Cl. at 199, 351 F.2d at 968 (citations omitted).

### B. *Liability and Causation*

The threshold elements of an equitable adjustment claim are the establishment of liability and causation. Liability is not currently at issue in this case for several reasons. Both the defendant and the plaintiff are in essential agreement that the government is liable for an adjustment as a result of the government imposed changes. Moreover, this court held that the government's liability is not limited to the $14.2 million NTE price. *Delco,* 12 Cl.Ct. at 371. On several occasions, the defendant attempted to inject liability issues into this, the damages phase of the case. In essence, the defendant attempted to evade the 1987 liability judgment and now asserts that the plaintiff is entitled to no recovery, and in fact must remit money to the government. The court consistently rejected these arguments.

In order for a contractor to recover, the cost increase must be shown to have been caused by the event for which the adjustment is being granted. *J.W. Bateson Co.,* VACAB No. 1148, 79–1 B.C.A. ¶ 13,537 at 66,497 (1978). Within the legal lexicon of government procurement, the element of causation is, to a certain extent, conceptually akin to the concept of allocability. Allowable costs associated with a change caused by government action may be said to be allocable. As DAR section 15–201.4 states, a cost is allocable if it "is assignable or chargeable" to the contract. 32 C.F.R. § 15–201.4 (1981). In *Southeastern Services, Inc.,* ASBCA No. 21278, 78–2 B.C.A. ¶ 13,239 (1978), the board stated "the contractor has the burden of establishing the fundamental facts of causation and resultant injury." *Id.* at 64,756.

■ There is little discussion in the reported case law regarding causation in government contracts claims. Generally, however, it can be said that there are two central aspects to proving causation. The first is the establishment of a time relationship—a determination that the costs followed the event in a predictable sequence. Second, the contractor should establish a logical connection between the costs and the event upon which the equitable adjustment claim is based. *See* J. Cibinic & R. Nash, *Administration of Government Contracts* 480 (2d ed. 1985).

With respect to the element of causation in this case, the government does not dispute that the changes imposed by the Air Force caused the plaintiff to incur some of the costs now claimed. The defendant admits that some adjustment of contract price is necessary, but simply contests the amount. However, the defendant's allegations of mismanagement at Delco and Gull, of the failure of Delco to properly supervise the program, and the attack on Gull's designs and solutions, which are discussed *infra,* do call into question certain causal elements of the plaintiff's claim.

### C. *Reasonableness of Amount*

■ The parties agree that the plaintiff may only recover costs that are reasonable. Reasonableness, however, is not easily defined. Although the concept is deeply embedded in both the criminal and civil laws, it defies jurists in its difficulty of definition. Justice Louis Brandeis once wrote of the concept: "We call that action reasonable which an informed, intelligent, just-minded, civilized man could rationally favor." *Quaker City Cab Co. v. Pennsylvania,* 277 U.S. 389, 406, 48 S.Ct. 553, 556, 72 L.Ed. 927 (1928) (Brandeis, J. dissenting). Yet, Lord Goddard of the Queen's Bench cautioned, with respect to this ideal reasonable man that "[n]o court has ever given, nor do we think ever can give, a definition of what constitutes a reasonable or an average man." *Regina v. McCarthy,* 2 Q.B. 105, 112 (1954).

■ One source of guidance on the concept of reasonableness is the Defense Acquisition Regulations, which, as the Federal Circuit stated " 'is law which governs the award and interpretation of contracts as fully as if it were made a part thereof.' " *Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 426 F.2d 314, 317 (1970)). DAR

section 15–201.3, relating to contract cost principles, defines reasonableness as follows:

15–201.3 *Definition of Reasonableness*

(a) *General.* A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of competitive business. The question of reasonableness of specific costs must be scrutinized with particular care in connection with firms or separate divisions thereof which may not be subject to effective competitive restraints. What is reasonable depends on a variety of considerations and circumstances involving both the nature and amount of the cost in question. In determining the reasonableness of a given cost, consideration shall be given to—

(i) whether the cost is of a type generally recognized as ordinary and necessary for the conduct of the contractor's business or the performance of the contract;

(ii) the restraints or requirements imposed by such factors as generally accepted sound business practices, arm's length bargaining, Federal and State laws and regulations, and contract terms and specifications;

(iii) the action that a prudent businessman would take in the circumstances, considering his responsibilities to the owners of the business, his employees, his customers, the Government and the public at large; and

(iv) significant deviations from the established practices of the contractor which may unjustifiably increase the contract costs.

32 C.F.R. § 15–201.3 (1981). Thus, the regulations provide little more instruction than to refer to the actions of the elusive reasonable and prudent man. The determination of a reasonable recovery, it seems, can only be made by reference to contemporary notions of fairness and equity, and by taking into account the totality of circumstances. The duty of the court then, is to determine what a reasonably prudent contractor would have done under the circumstances that confronted Delco.

D. *Methods of Proof*

The courts and the boards of contract appeals recognize a variety of methods of proving costs. A contractor must prove its costs using the best evidence available under the circumstances. The preferred method is through the submission of actual cost data. *See Cen–Vi–Ro of Texas, Inc. v. United States,* 210 Ct.Cl. 684, 685, 538 F.2d 348 (1976). The preference for actual cost data is reflected in the regulations, which require that contractors submit cost and pricing data that are "accurate, complete and current." DAR § 3–807.3(a), 32 C.F.R. § 3–807.3(a) (1981). In maintaining cost data, a contractor should segregate costs associated with the change where it is feasible to do so, and especially where the contractor can anticipate submitting a large claim. *See Parsons of California,* ASBCA No. 20867, 82–1 B.C.A. ¶ 15,659 at 77,416, 77,421 (1982); *Baifield Industries, Division of A–T–O, Inc.,* ASBCA Nos. 13418, 13555, 17241, 77–1 B.C.A. ¶ 12,308 at 59,455 (1976), *aff'd,* 29 C.C.F. ¶ 82,237 (Ct.Cl. Tr. Div.1982).

Where actual cost data is not available, estimates of the costs may be used. Such estimates should be prepared by competent individuals with adequate knowledge of the facts and circumstances. Estimates should also be supported with detailed substantiating data. *See Paccon, Inc.,* ASBCA No. 7890, 65–2 B.C.A. ¶ 4996 at 23,573–76, *reconsid. denied,* 65–2 B.C.A. ¶ 5227 (1965). The expert testimony of individuals familiar with the facts is helpful in verifying the validity of estimates.

II. *The Evidence on Damages*

A. *An Overview*

The court concludes that, overall, the record demonstrates that the changes imposed by the Air Force had a substantial cost impact on the FSA/CAS program. The court observes that these costly claims quite probably could have been avoided had the Air Force initially made the correct

determination of the design requirements for the FSA/CAS equipment in the –135 aircraft. The overwhelming impression drawn from the record is that although the original contract called for the delivery of a previously developed "off-the-shelf" fuel panel, the changes imposed by the Air Force necessitated the development of an entirely new component employing design and manufacturing techniques at and beyond the current state of the art. The demands of the revisions to the fuel panel clearly exceeded the requirements for the design and production of the system under the original contract. This is a central and uncontroverted finding in this case that bears directly on the court's decisions on entitlement.

Although the defendant introduced evidence that, in varying degrees, calls into question many of the plaintiff's claims, it did not present a persuasive theory of the case. The government's theory in defending this case was essentially that Delco mismanaged the program after the imposition of the changes, in complete disregard of the costs. The defendant implied that Delco conducted improper negotiations with its subcontractors and devised unsupportable claims because the costs were a "pass-through" to the Air Force. This theory did not stand up in the light of day.

The defendant in particular attacked Gull's design solutions and management. Reasonableness, however, must be determined in light of all the facts and circumstances of each case viewed from the point in time at which the problem occurred. *Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank,* 611 F.2d 465, 471 (3rd Cir.1979). The defendant, with the benefit of 20/20 hindsight, complained of Delco's and Gull's mistakes and mismanagement. Such criticism, it seems, would be more justifiable if the government's changes had merely required the production of another "off-the-shelf" piece of equipment.

■ Such was not the case here. What the government finally demanded had never been produced before and required advancements in state-of-the-art production.

The changes also required performance well beyond that contemplated at contract award. It has been recognized that a contractor's costs will be considered reasonable in spite of production difficulties and delays where a government change order demands a much higher degree of technical skill and expertise than would have normally been expected under the original contract. This principle was acknowledged by the Supreme Court in the early case of *Carnegie Steel Co. v. United States,* 240 U.S. 156, 36 S.Ct. 342, 60 L.Ed. 576 (1916). There the Court ruled that a contractor delayed by production difficulties in manufacturing steel plate of a quality beyond the current state of the art was not excused, but only because it had specifically undertaken to manufacture such an advanced product, and the production difficulties encountered were foreseeable at the time of award. *Id.* at 164–65, 36 S.Ct. at 344–45.

In *Utah–Manhattan–Sundt,* ASBCA No. 8991, 1963 B.C.A. ¶ 3839, *reconsid. denied,* 1963 B.C.A. ¶ 3854, however, the Armed Services Board of Contract Appeals granted a price adjustment and relied on *Carnegie Steel* in ruling that a contractor was excused for its subcontractor's delays due to production difficulties beyond the existing state of the art and which were outside the contemplation of the parties at award. *Id.* at 19,148. The Board in *Utah–Manhattan* distinguished *Carnegie Steel* because the *Carnegie Steel* plaintiff specifically contracted to manufacture a product that advanced the state of the art and assumed the risk for the difficulties it experienced. *Id.* at 19,149.

The principle of allowing an equitable adjustment, in spite of performance difficulties, where government requirements exceed expectations at contract award, was applied by the Court of Claims in *Southwest Welding & Manufacturing Co. v. United States,* 188 Ct.Cl. 925, 413 F.2d 1167 (1969). In discussing the original contract specifications, the *Southwest Welding* court stated that "[t]his is a case in which the Government clearly ordered extra work above and beyond the require-

ments of the contract which it had drafted, and it should reimburse the contractor therefor pursuant to the standard 'Changes' clause contained in this contract." *Id.*, 188 Ct.Cl. at 951, 413 F.2d at 1183.

The court concludes that these principles have a bearing on the reasonableness of many of the costs incurred and apply in weighing the evidence in this case. The evidence indicates that the revised fuel panel change required design and production at and beyond the current state of the art. The Air Force's changes also clearly exceeded the original demands of the contract. Given this central and uncontroverted finding, much of the defendant's attack on Delco's and Gull's management, and on Gull's designs, will not weigh heavily in the court's decision.

Not only did the defendant fail to prove its theory of this case, but much of the evidence it introduced was also flawed. The court observes that the conclusions of the audits conducted by the government in 1988 should be viewed cautiously because they were apparently prepared at the request of the Air Force in late 1987 for the express purpose of developing a defense to Delco's claim. The request for audit assistance referred to the fact that the case was in the midst of "hotly disputed litigation." Plaintiff's Exhibit 105. In addition, the conclusions of the 1988 reports were inconsistent with the earlier round of audits and technical reviews conducted by the government in 1983 and 1984, in which the reviewers supported most of the claim. These two facts joined together make the objectivity of the 1988 reports questionable. However, the 1988 audits and reviews are revealing of certain shortcomings in the plaintiff's claim.

In addition to the audits and technical reviews, the defendant also introduced the expert testimony of Dr. Peter H. Garrett, who attempted to call into question certain technical aspects of the revised fuel panel. At least twice during his testimony, however, counsel for the plaintiff called into question Garrett's credibility and demonstrated that the witness did not possess requisite familiarity with the components of the system to provide reliable criticisms. The plaintiff established that Garrett made mistakes in calculating the number of man-months employed by Gull in developing the software. Garrett, Tr. at 1262–63, 1308. Garrett was also shown to be in error in calculating the dimensions of Gull's IFM/CGS components. Garrett, Tr. at 1288–99. Accordingly, Garrett's technical criticisms will be given little weight.

### B. *The Jury Verdict Approach*

Despite the shortcomings in defendant's theory and evidence, in many aspects of the case the court is confronted with varying amounts of conflicting yet competent evidence on the appropriate amount for a reasonable recovery. The defendant raised serious questions concerning the accuracy and reliability of the claims presented in several of the exhibits. Although the fact-finding mission of a trial should ideally clarify the facts of a case, and ultimately should bring the litigants closer together in reaching a just outcome, such has not occurred here. Perhaps it is a peculiar dysfunction of the adversarial process that the parties, as a result of this litigation, are even farther apart than they were when it began.

Where a court or a board of contract appeals sitting as the finder of fact is confronted with competent but conflicting evidence on what is a reasonable amount for an equitable adjustment, it may employ what is referred to as the "jury verdict approach." The court may adopt the jury verdict approach where, (1) there is clear proof that the contractor was injured, (2) there is no more reliable method for computing damages, and (3) the evidence adduced is sufficient for the court to make a fair and reasonable approximation of the damages. *WRB Corporation v. United States*, 183 Ct.Cl. 409, 425 (1968). Indeed, this approach is advocated by the government in this case.

The conceptual touchstone for the use of the jury verdict approach is the existence of conflicting competent evidence calling into question the accuracy and reliability of

the plaintiff's computations. As the name implies, the technique by necessity requires the application of the fair, equitable and informed discretion of the trial judge. The court believes that the use of the approach is especially appropriate here, where the sole source of guidance is the nebulous concept of "reasonableness." In *Johnson, Drake & Piper, Inc.*, ASBCA Nos. 9824 & 10199, 65–2 B.C.A. ¶ 4868 (1965), the Armed Services Board of Contract Appeals discussed the application of the jury verdict approach in terms that are particularly appropriate here, and which reflect substantial similarity to the circumstances of this case. It stated:

There is neither a single nor a precise method of arriving at the dollar amount of an equitable adjustment. In general we seek to reach a figure as an equitable adjustment which represents the cost to a reasonably efficient contractor of performing the changed work under his contract. Evidence of this amount may be found in the actual costs of the particular contract, to the extent that those costs are not shown to be other than reasonable, and in engineering estimates of reasonable cost made by experts who bring into play their experience and knowledge to attempt to visualize the price at which that reasonably efficient contractor could perform. Neither estimating nor accounting are such exact arts that either can produce figures which will be agreed to by all parties without legitimate argument. We recognize that often, despite protestations to the contrary, extreme positions on monetary entitlement are taken during litigation. We think that this case is no exception.

Even though presented with wildly divergent monetary positions by the parties before us, we cannot escape the necessity of bringing an end to the matter and determining a figure as the amount of an equitable adjustment. This ordinarily is the figure some place between the amount contended for by each party to the litigation. Sometimes the courts have referred to such a conclusion as an amount in the nature of a "jury verdict." This is a figure which in the view of the trier of facts is fair in light of all the facts of the case, or, put another way, is supported by consideration of the entire record.

*Id.* at 23,073. These observations mirror the impressions of the court in considering the evidence presented. Accordingly, the court must determine what is "fair in light of all the facts."

## C. *The FSA/CAS Subcontractor Claims*

### 1. *Exhibit B—The Collins Effort Claim*

On behalf of Collins, Delco claims that it is entitled to recover $709,585, which it has already paid to Collins. Delco asserts that this amount is reasonable and that it is entitled to the full amount because it is the product of extensive fact finding and arm's length bargaining, and because it was paid to Collins at a time when Delco had no assurance that it would be able to recover this amount from the government. The defendant asserts that Delco should receive nothing on behalf of Collins. The defendant alleges that the amount claimed is not reasonable because Delco failed to receive adequate cost and pricing data from Collins for the negotiations, in accordance with regulations.

 The court agrees with the defendant that Delco's failure to obtain pricing data for negotiations should have a bearing on the recovery. DAR section 15–201.-3(a)(ii) makes federal laws and regulations a consideration in determining the reasonableness of a cost, and DAR section 3–807.-3(b)(ii) creates an obligation for contractors to obtain pricing data when negotiating with subcontractors. DCAA auditor Drascic testified that Delco failed to obtain adequate information from Collins, such as material overhead, labor burden rates and G & A rates. Drascic, Tr. at 1027–28, 1037–38. Collins also did not provide Delco with quotes from its vendors to substantiate that prices were increasing. Drascic, Tr. at 1037, 1039–40. The court does not agree, however, that these considerations mandate that Delco recover nothing on behalf of Collins. The regulations do not, as defendant asserts, require such a result.

As the plaintiff pointed out, there are other indications of reliability. The court finds that the negotiations between Delco and Collins were conducted at arm's length and in good faith. DAR section 15–201.-3(a)(ii) acknowledges that "arm's length bargaining" is an indication of the reasonableness of a cost. In *General Electric Co.*, ASBCA No. 24111, 82–1 B.C.A. ¶ 15,725, *reconsid. denied*, 83–1 B.C.A. ¶ 16,207 (1982), the board explained that its role in reviewing the reasonableness of a cost was "to assure that the settlement negotiations were conducted competently and in good faith, and that the settlement agreement was based on adequate information." *Id.* at 77,806. Accordingly, the fact that the negotiations between Delco and Collins were conducted at arm's length and in good faith weighs in favor of the plaintiff.

In addition, at the time Delco negotiated this amount with Collins it had no assurance from the government that it would be reimbursed in full. The defendant's assertion that Delco had no incentive to drive a hard bargain because the costs were essentially a "pass-through" to the Air Force is not borne out by the facts. The very fact that the defendant aggressively litigated this case to deny Delco's recovery makes this an unfounded assertion. Moreover, Delco already paid this amount to Collins. Costs such as these, which are actually incurred, may be presumed to be reasonable. *See Bruce Construction Corporation v. United States*, 163 Ct.Cl. 97, 101–02, 324 F.2d 516, 518–19 (1963).

■ Nonetheless, the court concludes that Delco's failure to obtain pricing data in accordance with DAR section 3–807.-3(b)(ii) represents a flaw in its claim on behalf of Collins. The failure to obtain such data seriously calls into question the reliability of the amount claimed. Accordingly, the failure to comply with applicable federal regulations warrants the adoption of the jury verdict approach in determining the amount of the plaintiff's recovery. The court rejects as meritless the defendant's assertion that Delco can recover nothing, as the evidence establishes that the govern-ment imposed changes had an impact on Collins. Because it is impossible to quantify an appropriate figure with mathematical exactitude, and because the government provided no guidance with respect to a reasonable alternative amount for Delco to recover on behalf of Collins, the court must decide what is fair and equitable, given the totality of the circumstances.

The court concludes that ⅔ of the claimed amount of $709,585 is a fair, equitable and reasonable amount for Delco to recover on behalf of Collins, given its failure to obtain pricing data required by federal regulations. This is a proportion that the court concludes is commensurate with the weight of the evidence favoring the plaintiff. This amount, excluding profit, is $473,057 for the effort listed at Exhibit B of plaintiff's claim.

*2. Exhibit C—The ESI Effort Claim*

Delco requests $4,155,698 on behalf of ESI for the "Group A" kits it provided under the FSA/CAS program. The changes in the fuel panel required ESI to provide new mounting equipment and installation material, which resulted in production delays. As with the Collins claim, Delco contends that it is entitled to recover this amount because it was the result of extensive fact finding and arm's length bargaining, and because it was negotiated with ESI at a time when there was no guarantee of reimbursement by the government. The defendant contends that Delco's recovery on behalf of ESI should be limited to $1.85 million, the total base cost that the DCAA Milwaukee auditors were able to verify in their 1988 audit. As with the Collins claim, the defendant contends that because Delco failed to obtain adequate cost and pricing data for its negotiations with ESI, it may recover no more than the amount verified by the DCAA.

The contentions of the parties here are nearly identical to those made with regard to the Collins claim. The defendant complains of Delco's failure to evaluate ESI's books and records to determine ESI's labor, overhead, G & A or CAS rates in the course of fact finding and negotiating with ESI. With respect to the second negotia-

tion for the 1985 schedule slip, the defendant contends that there are no records establishing the cause of the delay. However, as with the Collins claim, the court rejects the defendant's assertion that the plaintiff may recover none of the questioned costs as a result of the failure to obtain complete cost and price data under DAR section 3–807.3(b)(ii).

The same indicia of reliability and reasonableness exist with respect to the ESI effort as existed with the Collins effort. The court is satisfied that Delco and ESI conducted the negotiations in good faith and at arm's length. There was adequate incentive for hard bargaining because Delco had not yet settled with the Air Force. However, as with the Collins effort, Delco's failure to obtain adequate cost and price data, identified by the government auditors, seriously calls into question the reliability of the amount claimed and warrants the adoption of the jury verdict approach. In the 1988 audit, Defendant's Exhibit 270 at 8 n. 2, the government's auditors questioned $1,917,516 of the $3,771,372 of base costs for extra work and delays. The government admits that Delco is entitled to the $1,853,856 difference.

The court concludes that the same $\frac{2}{3}$ formula that was applied to the Collins claim is an appropriate formula for the amount questioned by the DCAA auditors to arrive at a fair and equitable recovery. Accordingly, Delco may recover $\frac{2}{3}$, or $1,278,344, of the $1,917,516 questioned by the DCAA, plus $319,190, as a proportionately offset amount of overhead on these questioned costs. This brings Delco's total Exhibit C recovery, excluding profit, to $3,451,390.

3. *Exhibit D—The Gull Effort Claim*

Gull was the subcontractor most severely affected by the Air Force's changes. Delco's claim on behalf of Gull represents the bulk of the total equitable adjustment claim. For the design and production of the revised fuel panel, Delco claims a total of $19,318,624. This amount represents the $17,700,293 NTE price established by Delco and Gull plus $1,618,331 in G & A and IR & D/B & P costs. Delco's method

for establishing the costs for Gull was a modification of the total cost method. The total cost method consists of merely subtracting the costs in the proposal price from the actual costs of performance.

Gull calculated that its total cost of performance was $46,705,822. From that amount, it subtracted $10,557,935 in costs which are not chargeable to the government or attributable to the changes, such as costs associated with the fire at Flexible Circuits. From the resulting modified total cost of $36,147,887, Gull subtracted the original proposal price of $15,314,702, leaving $20,833,185 as the total cost of the changes. Delco's claim, however, only requests recovery of the $17.7 million NTE price. Apparently, the remaining costs will be borne by Gull. This method of proving costs, it should be noted, is ordinarily disfavored by courts and boards because its use can fail to account for costs not allocable to the government.

The defendant contends that Delco is entitled to recover no more than $8.2 million on behalf of Gull. In particular, the defendant argues that Delco failed to mitigate damages by not limiting Gull's claim to $8.2 million when it had the opportunity to do so in 1983. The defendant further asserts that Delco's management, as a result of fact finding, knew that the $17.7 million NTE price agreed to was not a reasonable amount, and that Delco acted unreasonably when it deviated from its own practice of locking in subcontractors by negotiating a firm fixed price. Finally, the defendant states that the total cost approach employed by Delco and Gull should be rejected because Delco has not sufficiently demonstrated that the approach is a reliable one here.

It should be emphasized again at this juncture that the primary impact of the changes fell on Gull. The original contract specifications merely required that Gull deliver a relatively routine derivative of a product it had supplied in the past. Ultimately, Gull was required to produce an entirely different design which necessitated production at, and in advance of, the current state of the art. Gull was forced to

perform a task that was far beyond what it had originally agreed to do. Given the fact that Gull is a small business that never intended to undertake such a program, its performance was actually considered good. This is a central and uncontroverted finding in this case, and it has a direct bearing on the reasonableness of the costs claimed.

The defendant makes much of the failure of Delco and Gull to perform adequately and of management errors at both companies. However, given the taxing nature of the changes imposed, the defendant's contentions on these grounds do not weigh heavily in the court's decision. Regarding the defendant's attack on Gull's design solutions, these arguments in part ignore the court's ruling of July 25, 1988, wherein the court found that the Air Force approved the designs presented by Delco and Gull in the October 1982 CDR. (Claims Court Order of July 25, 1988 limiting issues for trial, at 2–3).

The defendant takes issue with Delco's decision not to lock Gull into a firm fixed price agreement in 1983, when it had the opportunity to do so. The government also complains of Delco's failure to conduct fact finding at Gull until January 1984. The reasonableness of these actions must be judged with reference to the particular circumstances of the particular contractor at the particular point in time. *Bruce Construction*, 163 Ct.Cl. at 101, 324 F.2d at 518. The court notes here that the defendant mischaracterizes the standard for judging the plaintiff's conduct as a question of mitigation rather than reasonableness. Although the contractor's actions to mitigate damages do have a bearing on the overall reasonableness of the amount claimed, *Toyota Industrial Trucks*, 611 F.2d at 471, reasonableness, and not the failure to mitigate, is the standard of review for equitable adjustment claims.

The defendant argues that Delco was obligated to accept Gull's NTE offer of $8.2 million in 1983; however, for at least part of that time, Delco was still operating under the limited direction of the contracting officer to perform only the engineering design work for the revised fuel panel.

Regarding Delco's decision not to conduct fact finding until 1984, Delco's Italiano explained that fact finding at Gull was not conducted before January 1984 because the Gull design was not yet mature and because Delco was not confident of the numbers that Gull provided. Italiano, Tr. at 56–57, 596. Kuczkowski also testified that there was significant engineering work taking place, and that the design was in an evolutionary stage. Kuczkowski, Tr. at 78–79. Unlike the other subcontractors, the impact of the changes on Gull was severe and direct. Contrary to the defendant's assertions, it was entirely reasonable for Delco to respond differently to Gull in its efforts to lock in subcontractor prices. Although certainly the defendant disagrees, the court concludes that under the circumstances at that time, the plaintiff acted reasonably.

In addition to the numerous allegations made by the defendant concerning Delco's and Gull's failure to contain costs, the defendant challenges the plaintiff's use of a modified total cost approach to support its claim. As the Court of Claims stated, the total cost approach "has never been favored." *WRB Corporation*, 183 Ct.Cl. at 426. For good reason, courts and boards view the total cost approach with a jaundiced eye. This tendency, no doubt, is rooted in the desire to encourage contractors to maintain accurate cost records and to foster accountable and efficient performance. To allow contractors to easily submit equitable adjustment claims by merely adding up the costs would not serve the goals of efficiency and integrity in government procurement. There are, however, certain situations where the total cost method is the best and only means of quantifying the impact of changes on a contractor.

As the Court of Claims explained, the total cost approach will be considered reliable, and the cost figures arrived at thereby will be considered reasonable, if certain indications of reliability are present. These are where: "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable

degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *WRB Corporation*, 183 Ct.Cl. at 426. The evidence adduced at the trial indicates that these criteria are substantially satisfied.

Regarding the first factor, the government earnestly maintains that Gull should have segregated the costs associated with the changes. As the plaintiff points out, however, the government's complaints of Gull's failure to segregate costs are not consistent with the facts concerning the impact of the change on Gull. Segregation is a method for identifying and separating the costs of work that are the result of a change from the work that was originally required. *See J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 247 (1965). The changes to the original fuel panel that Gull agreed to manufacture began shortly after the award of the contract and before any substantial work was done on the original design, and then occurred again a few months later. After the revisions were complete, nothing was left of the original design. For all practical purposes, none of the originally projected costs continued into the project as changed. Because all the work was changed work, there would be no point in segregating the costs as there was nothing separate to identify.

The government's repeated insistence that Gull failed to properly segregate costs in accordance with accounting standards and regulations is simply a recital of rules that have no application to the facts. Although government witnesses testified that Gull was capable of creating separate work orders and should have segregated costs, none offered an explanation as to how the procedure could be conducted when nothing remained of the original work from which to segregate the new work. In *Robert McMullan & Sons, Inc.*, ASBCA No. 19129, 76–2 B.C.A. ¶ 12,072, the ASBCA found that segregation was impractical where a contractor's performance was changed early in the contract, and was continuously interrupted and extended by government action. The observations of

the board in that case seem appropriate given the facts before the court now. It stated:

> [A]ppellant's claim is that the right to an equitable adjustment arose almost from the beginning of the contract and continued and enlarged itself in almost every day of contract operations to completion, all due to the fault of the Government. To that claim we agree. To attempt to segregate delay and lost time, set up and breakdown estimates, delay in transit from one location to another on site and loss of efficiency as opposed to normal time would be a wasteful exercise for, in the end, the result should approach the total cost actually experienced. Had we some period of performance free of the dispute we might be better able to judge the damages based on estimates. It is impractical if not impossible to determine with any real degree of accuracy the contract work from the extra work.

*Id.* at 57,962. As the *McMullan* Board concluded, the result of any segregation where all the work performed is changed work would be the same as the total cost of performance actually experienced. Accordingly, the court finds that Gull largely satisfied the first requirement.

The court also concludes that the second criterion, that the original subcontract price was realistic, is for the most part fulfilled. The court received evidence that Gull's proposal for the original contract was performed by highly qualified personnel and was based on extensive experience building equipment for commercial planes similar to that called for by the original contract. The defendant did not submit much direct evidence on this issue. The defendant's contention that because the contract was "aggressively priced" by Delco leads to a conclusion that the same must be true for Gull, and that such competitive factors detract from the reasonableness of the proposal, simply has no merit. Likewise, the fact that Gull's estimates varied slightly in some areas from the actual costs of performance does not defeat a finding of reasonableness.

Delco must also establish that Gull's actual costs were reasonable under the *WRB Corporation* criteria. The court is persuaded, for several reasons, that they were. The court heard a litany of credible testimony from Gull's witnesses substantiating the reasonableness of its incurred costs. The DCAA Suffolk County Branch that performed an assist audit of Gull's Q13490 Rev. E proposal in 1988 questioned only $1.2 million of the total $23.7 million in costs audited. The reasonableness of Gull's costs is also confirmed by the price negotiated for spare LRUs, which are not part of this claim. The Air Force agreed to a price for the same equipment that was significantly higher than the amount claimed for the equipment here. Moreover, the fact that Gull was called upon to perform above and beyond the call of the original contract, given its small size and previous experience, indicates that under the circumstances the costs actually incurred were reasonable.

Finally, Delco must show that Gull was not responsible for any of the costs included in its claim. The government attempted to show that certain amounts claimed should be allocated to Gull. For instance, the government alleged that Gull was inefficient in resolving a noise filtering problem and that Gull was inefficient in designing software. However, as already noted, costs may be considered reasonable if they are the result of difficulties arising from government imposed changes more demanding than the requirements of the original contract. Indeed, the DCAS engineer that examined Gull's claim acknowledged that the costs of false starts and problem solving are allocable to the change.

The plaintiff has thus made a good case for recovering the $20,833,185 total cost of the changes for Gull. It does not, however, request this amount. Under its modified total cost approach, plaintiff asks only for the $17,700,283 NTE price.

As an alternative, the defendant advocates the use of the jury verdict approach for this claim, correctly emphasizing that the total cost approach is judicially disfavored. The use of the jury verdict approach requires the existence of conflicting competent evidence. Such evidence does exist to a limited extent for this claim, but has been accorded little weight. Under the jury verdict approach, the court will award a contractor an amount which "is fair in light of all the facts of the case." *Johnson, Drake*, 65–2 B.C.A. at 23,073. The court concludes, however, that a consideration of all the facts in this case favors a full recovery. Thus, under the jury verdict approach, the court in its discretion would nonetheless award the plaintiff the full amount requested for the Gull effort claim.

The court concludes that under either a modified total cost approach or a jury verdict approach, the record as a whole supports the recovery of the full NTE price of $17,700,283, plus the $1,618,341 in overhead, for a total recovery on Exhibit D of the claim of $19,318,624.

### E. The Delco Claims
#### 1. The Exhibits A & G Engineering Costs

Exhibits A and G of Delco's claim include approximately $3.6 million in costs which were allegedly incurred by Delco for additional engineering, program management, and other work effort at its Santa Barbara and Milwaukee facilities. According to the plaintiff, the changes required additional effort at Delco's Santa Barbara facility where the engineering effort was performed. These efforts included assessing the technical ramifications of the change and providing new technical direction to affected subcontractors; reviewing and assessing technical solutions proposed by the subcontractors; providing additional support to various test activities; and rewriting a substantial amount of the manuals, data, and other documentation required by the contract.

At its Milwaukee facility, where the program management function was performed, and during later stages of the program, where technical functions were also assumed, the changes resulted in substantial additional program management and engineering labor. This effort included review of subcontractor efforts; technical

support of subcontractors; increased communications with the Air Force regarding the change; and preparation for and attendance at numerous additional meetings and technical sessions, such as the October 1982 CDR.

The defendant contends that because the costs for the Santa Barbara and Milwaukee effort are insufficiently supported, they should be denied in their entirety. At the outset, the court observes that the evidence adduced at trial clearly indicates that the changes imposed by the Air Force had a substantial impact on Delco's Santa Barbara and Milwaukee facilities. In the face of this evidence, the defendant makes the rather extreme contention that the legal requirements for a contractor to support and document its costs somehow serve as a punitive device to punish a contractor where the support for its claim is found to be flawed. The law does not necessarily provide for such a result. Because the defendant has taken this hardline tack, it has also failed to provide the court with a reasonable alternative means of quantifying costs that undeniably were incurred.

The defendant presented credible evidence, however, that calls into question the accuracy and reliability of the Santa Barbara and Milwaukee cost claims. Regarding the Exhibit A Santa Barbara claim, the 1984 DCAS report was highly critical of Delco for not segregating its costs and for failing to provide any supporting data to back up its claim. The court received evidence that Delco's accounting department had the ability to segregate the costs of the changed work and that the engineers who actually performed the work were capable of identifying work that was associated with the revised fuel panel change. As a result of the 1988 audits, the DCAA auditors stated, among other things, that Delco was incapable of justifying its selection of impacted work orders and that no documentation was maintained of an April 17, 1984 meeting where cost estimates were developed.

The defendant makes similar charges concerning the lack of support for the Exhibit G, Milwaukee effort costs. The estimates developed for this claim were apparently made on a blackboard, which was erased after the meeting, with no one attending retaining any notes. The DCAA was also critical of the lack of any other data supporting the estimates. The defendant argues that these actions do not represent the generally accepted business practices of a reasonably prudent contractor to whom the court is to look for guidance.

In response, the plaintiff points out that estimates, such as those employed by Delco here, are a completely acceptable means of proving costs. As the Armed Services Board stated "[e]stimates are acceptable if they are supported by detailed substantiating data or are reasonably based on verifiable experience." *J.M.T. Machine Co.*, ASBCA Nos. 23928, 24298, 24536, 85–1 B.C.A. ¶ 17,820 at 89,181 (1984), *aff'd on other grounds,* 826 F.2d 1042 (Fed.Cir. 1987). Delco demonstrated that its estimates were prepared by engineers and program managers experienced in preparing such estimates and acquainted with the contract and the changes. Although the court finds this to be so, the defendant's evidence indicates that Delco could have, and should have, made better efforts to support its claims.

In particular, regarding Delco's failure to segregate costs, the plaintiff contends that it was not technically feasible to segregate costs. The plaintiff maintains that because the nature of the work was not changed, it was not practical for Delco to separately identify the additional work required by the change from the work required under the original contract. It is interesting to observe, that on one hand, Delco asserts that it was not feasible or practical for Gull to segregate costs because the nature of the work was changed *in its entirety,* while on the other, it contends that segregation was not feasible or practical at its own facilities because the nature of the work was not changed *at all,* just increased in amount. The court agrees with the plaintiff's argument under the former circumstances, but not under the latter.

Although Delco's employees may have believed that segregation and documenta-

tion were not practical or convenient, the court concludes that such actions were prudent under the circumstances. Delco was perfectly capable of segregating costs. It did so for its efforts to support Gull, which are included in the claim at Exhibit H. In addition, the summary that the plaintiff provided outlining its efforts in Santa Barbara and Milwaukee suggests that segregation of costs was more feasible than Delco's employees admitted in response to the government's criticisms. Credible evidence was provided that Delco had the capability to segregate costs and simply chose not to do so. The court concludes that segregation of costs was not so impractical as to be unduly burdensome.

Accordingly, the court concludes that the plaintiff's failure to segregate costs and maintain supporting documentation and data represents a flaw in its claim. This flaw brings into question the reliability of the amount sought. The court does not accept the defendant's "wildly divergent" position, *Johnson, Drake,* 65–2 B.C.A. at 23,073, that these shortcomings somehow deprive a contractor of any recovery for effort that competent evidence proves was expended. Moreover, this extreme position has left the court without any reasonable alternative guidance for the quantum of the recovery. Faced with conflicting competent evidence as to the appropriate amount of the recovery, the court must resort, once again, to the jury verdict approach.

In considering the totality of circumstances and the record as a whole, the court concludes that the plaintiff may recover ⅔ of the amounts claimed for Exhibits A and G. This proportion, the court believes, is proportionate to the weight of the evidence favoring the plaintiff. Therefore, the plaintiff may recover $1,286,467 of the $1,929,701 claimed for Exhibit A, the Santa Barbara effort, and $1,128,655 of the $1,692,982 claimed for Exhibit G, the Milwaukee effort.

### 2. *The Exhibits E, E1 & F FSAS Computer Costs*

■ Delco claims $1,957,414 for delays in the manufacture of its FSAS computer,

Exhibits E and F, and $222,464 for delays in the production of spare FSAS computers, Exhibit E–1. The design of the computer was not changed as a result of the revised fuel panel change. Delco delayed production of the computer until it was confident that the revisions would have no impact on its design. The defendant once again contends that the plaintiff may recover nothing for the delays.

The methodology used by Delco in calculating the costs of the schedule extension consisted of subtracting the manufacturing labor hours and material costs priced using rates applicable during the period of performance scheduled by the original contract, from the same labor and materials repriced using rates applicable during the actual period of performance. Based on the evidence presented by the plaintiff, the court finds that this delay did in fact occur and was directly the result of the revised fuel panel change.

The changes clause in the FSA/CAS contract provides that:

> If any such change causes an increase or decrease in the cost of, or the time required for the performance of any part of the work under this contract, *whether changed or not changed by any such order,* an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly.

Plaintiff's Exhibit 1 at 24 (incorporating by reference DAR § 7–103.2, 32 C.F.R. § 7–103.2 (1981)) (emphasis added). In order to recover on a delay claim, the contractor must prove that it was delayed in performing the contract, that the delay was caused by the government without the fault of the contractor, that there were no concurrent delays caused by the contractor, and that the contractor was damaged by the delays. *See Wunderlich Contracting,* 173 Ct.Cl. at 199–200, 351 F.2d at 968–69. The court is satisfied that the evidence provided by the plaintiff conclusively proved each of these elements, and that the facts support a recovery for the plaintiff under the changes clause.

In addition, the government's own personnel established the validity of these costs. DCAS Price Analyst Williams, who reviewed Delco's proposal in 1984, determined that Delco's FSAS manufacturing schedule was in fact delayed by the revised fuel panel change and that Delco's methodology for pricing the impact of the delay was valid. Williams, Tr. at 894–95. Beckstrom, the DCAA auditor who reviewed these costs in 1988, also verified that the schedule was delayed and that the methodology used by Delco was reasonable. Beckstrom, Tr. at 995, 1010, 1014.

The defendant contends that Delco may recover nothing for its delay claim, asserting essentially that no real delay occurred, and, alternatively, that if there was a delay, it did not result in increased costs for Delco. The court rejects both these contentions, noting that although the plaintiff's evidence does not prove the costs incurred with mathematical precision, the defendant failed to introduce evidence conclusively establishing that the delays did not in fact occur, or that there was no cost impact on Delco as a result.

The defendant alleges that Delco may not have been injured by the schedule slip because the delivery date for the computers, on which Delco relied in preparing the claim, may not reflect the actual production schedule. The defendant also asserts that a cost impact may not have in fact occurred because precise information on the length of time for producing the computers was not available, and because the actual build schedule for the computers was not available. In addition, the defendant alleges that the delays were attributable to Gull's management and technical problems, rather than the government.

The defendant offered no conclusive evidence to support its allegations. The court agrees with the conclusions of Williams and Beckstrom that the methodology employed by Delco to compute its costs was reliable and reasonable. With regard to the defendant's assertion regarding the relationship between delivery dates and build dates, it should be noted that delivery dates were used in preparing the original FSA/CAS proposal, and the government apparently made no objection. Italiano Tr. at 1338, 1343. Also, only 154 of the 724 computers manufactured had build dates that varied from the actual delivery dates. For the remaining 570 computers, the build and delivery dates were the same. Italiano, Tr. at 1338–40. Regarding the defendant's contention that Gull was responsible for the delay, in light of the court's earlier findings that it was the extraordinary demands made of Gull that caused such difficulties, these allegations have little weight.

The revised fuel panel change also resulted in the delay of the production of certain spare equipment. The direct costs associated with this schedule impact are shown at Exhibit E–1 of the claim. The same methodology was used to compute these costs as was used to compute the costs in Exhibits E and F. Delco claims a total of $222,464 for this schedule impact. The defendant again contends that Delco may recover nothing here for the same reasons it would deny recovery for Exhibits E and F. The court concludes, however, that the evidence proves the plaintiff is entitled to recover these costs. Accordingly, the plaintiff may recover $1,957,414 on Exhibits E and F, and $222,464 on Exhibit E–1.

### 3. The Exhibit E–2 EMPAT Costs

The FSA/CAS contract required Delco to design and manufacture 57 EMPAT units. As a result of the revised fuel panel change, Delco was required to modify the EMPAT design to provide test capability for an additional LRU—the FMC. Delco was required to revise the electric circuitry to add a programmable read only memory chip, and to design and build a new interface harness. Delco incurred material costs for the changes to EMPAT of $32,439, totaling $34,739 with G & A and IR & D. Its claim for this amount is contained in Exhibit E–2.

The plaintiff updated its $67,632 claim after trial and deleted labor costs associated with the modification of the EMPAT equipment. The parties advised the court that these costs are the subject of separate negotiations. Because Delco

withdrew its claim for these costs from this case, it is not necessary to address the defendant's post trial arguments. The defendant also contests $10,419 in material costs based on the DCAA auditor's questioning of costs for a deleted part and the use of the wrong pricing rates. The court, however, accepts the plaintiff's explanation that the claimed material costs are the actual purchase prices of the parts used in building the EMPAT units. Italiano, Tr. at 1340, 1344–45. Actual costs are presumed reasonable. *Bruce Construction*, 163 Ct.Cl. at 101–02, 324 F.2d at 518–19. Accordingly, the plaintiff may recover $34,739 for Exhibit E–2.

### 4. *The Exhibit H Gull Support Effort Costs*

Delco claims $199,720 for costs incurred in providing technical support for Gull. As the plaintiff contends, the record is uncontroverted that the costs of this effort were actually and reasonably incurred, were incurred solely for the purpose of assisting Gull in performing the revised fuel panel change, and would not have occurred but for the change. The costs of the work were segregated by Delco under a specific work order. The government previously admitted that the Exhibit H costs are reasonable and allocable to the revised fuel panel change. Plaintiff's Exhibit 119 at 31–31b.

The defendant argues that the plaintiff may recover none of the costs claimed in Exhibit H because it failed to establish that the costs incurred were actually caused by the revised fuel panel change and not some other cause, such as technical and managerial incompetence at Gull or the fire at Flexible Circuits. Consistent with the court's conclusions regarding Exhibit D, the Gull Effort claim, the court must reiterate that these allegations were rejected because of the demanding nature of the changes that were imposed on Gull and because the court agrees with the DCAA's conclusion that these support efforts were fully justified, reasonable and allocable to the change. Accordingly, the plaintiff may recover $199,720 for Exhibit H.

### 5. *Other Items Claimed*

The court agrees with the defendant that the $206,947 in costs included in Exhibit K for legal, accounting and consulting services are directly related to the prosecution of this claim and that such costs are unallowable. DAR section 15–205.31(d) states that the "[c]osts of legal, accounting and consulting services, and related costs, incurred in connection with ... the prosecution of claims against the government, are unallowable." 32 C.F.R. § 15–205.31(d) (1981). The court concludes that the circumstances enumerated by the Court of Claims in *Singer Co., Librascope Division v. United States*, 215 Ct.Cl. 281, 568 F.2d 695 (1977), acknowledging the allowability of the recovery of claim preparation costs in limited cases, are not present here. In *Singer*, the court recognized a very limited exception to the rule against the recovery of claim preparation costs where there is both an acknowledgement by the government of the contractor's entitlement and where the adjustment is made in the midst of contract performance. *Id.*, 215 Ct.Cl. at 325–28, 568 F.2d at 720–21. Accordingly, the plaintiff may not recover the costs claimed in Exhibit K.

The parties do not dispute the amount of the credits due the government included in Exhibits I and J of the claim, and there is therefore no need to discuss those items. The government will be credited a total of $2,638,793 for Exhibits I and J.

Delco included a claim for COM in the amount of $127,389, under CAS 414, 4 C.F.R. § 414 (1981). The defendant would have the court deny the COM claim because it contends that the underlying base costs to which COM is allocated should be disallowed. The plaintiff's COM allocation was added only to Delco's in-house costs and was not allocated to the subcontract costs (Exhibits B, C and D). COM was also not allocated to the three items which were quoted at the sell price (Exhibits E–1, I and J). The court offset the amounts listed for COM, Plaintiff's Exhibit 172, in proportion to the amounts allowed for recovery. Thus, plaintiff will recover ⅔ of its COM for Exhibits A and G, the full amount for

Exhibits E, F and H, and nothing for Exhibit K. Accordingly, the plaintiff may recover $105,540 for its COM claim.

Finally, Delco is entitled to a fair and reasonable profit on its equitable adjustment. *General Builders Supply Co. v. United States,* 187 Ct.Cl. 477, 482, 409 F.2d 246, 249 (1969). Delco, after updating its claim, requests a profit of 12%. The government suggests that a rate of 6% to 7% is reasonable under the circumstances. The regulations set forth certain factors in determining a reasonable rate of profit, including performance risk and contract type risk. *See* DAR § 3–808.3–8, 32 C.F.R. 3–808.3–8 (1981). Consideration should also be given to the contractor's effort.

Although the court determined that Gull was required to design and produce a product at and in advance of the current state of the art, the weight given this finding also acknowledges Gull's relatively small size and the fact the the original contract was significantly less demanding. The court concludes that the efforts and risks undertaken by Delco itself justify a standard amount of profit. Professors Cibinic and Nash suggest this amount to be 10%. J. Cibinic & R. Nash, *supra* at 518. Therefore, Delco may recover 10% of the equitable adjustment base amount as profit. The base for profit excludes COM and the three items quoted at the sell price (Exhibits E–1, I and J). Profit should thus be applied to a base cost of $27,850,066, yielding a total profit of $2,785,007.

### III. *Summary*

#### A. *Total Recovery for the Claim*

The court has determined that the plaintiff shall recover the following amounts for each of the Exhibits forming its total claim.

| Exhibit | Description of Effort | Recovery |
|---|---|---|
| A | Delco–Santa Barbara | $ 1,286,467 |
| B | Collins | 473,057 |
| C | ESI | 3,451,390 |
| D | Gull | 19,318,624 |
| E & F | FSAS Mfg. Sched. | 1,957,414 |
| E–1 | FSAS Spares | 222,464 |
| E–2 | EMPAT | 34,739 |
| G | Delco–Milwaukee | 1,128,655 |
| H | Delco–Gull Support | 199,720 |

| Exhibit | Description of Effort | Recovery |
|---|---|---|
| K | Employee Costs | + 0 |
| Total for Added Work | | $28,072,530 |
| | Cost of Money | 105,540 |
| | Profit at 10% | + 2,785,007 |
| Total Increase With Profit | | $30,963,077 |
| Undisputed Credits | | |
| I | ICS Impact Credit | $ 141,096 |
| J | 3 to 2 Level Maintenance Credit | + 2,497,697 |
| Total Credits for Deleted Work | | $ 2,638,793 |
| Total Increase With Profit | | $30,963,077 |
| Total Credits | | – 2,638,793 |
| TOTAL EQUITABLE ADJUSTMENT | | $28,324,284 |
| Credits for Mod P00017 and P00056 | | – 14,219,000 |
| TOTAL JUDGMENT | | $14,105,284 |

### CONCLUSION

In conclusion, the court holds that the plaintiff is entitled to a total equitable adjustment, including profit, and reduced by the amount of the undisputed credits for Exhibits I and J, of $28,324,284. Offsetting this amount by the $14,219,000 that the plaintiff was already paid for Mods P00017 and P00056, the court concludes that the plaintiff is entitled to a total judgment of $14,105,284. Accordingly, the Clerk will enter judgment in favor of the plaintiff in the amount of $14,105,284, plus interest from July 18, 1985. Each party will bear its own costs.